IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| LATASHIA ALEXANDER, LUZ MARIA VALDEZ, and ANNICE B HUTCHINSON, On Behalf of Themselves and All Others Similarly Situated, | § § § § § | |
| Plaintiffs, | § § | Civil Action No. 3:05-CV-339-M |
| v. | § § | |
| U.S. CREDIT MANAGEMENT, INC. | § § | |
| Defendant | § § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is the First Amended Motion to Dismiss and Compel Arbitration of Defendant U.S. Credit Management, Inc. ("USCM"), filed on March 18, 2005.  Having considered the Motion, as well as the parties' Response and Reply, the Court is of the opinion that the Motion should be DENIED.

### I. Background

Plaintiffs have filed a purported class action on behalf of themselves and other customers of USCM, which advertises itself as "the national debt elimination and credit counseling company." Pls.' Resp. to Def.'s 1st Am. Mot. to Dismiss and Compel Arbitration at 7 ("Pls.' Resp."). Plaintiffs charge USCM with numerous violations of: the Credit Repair Organizations Act

("CROA" or "the Act"), 15 U.S.C. §§ 1679-1679*i* (2005), including violations of disclosure and fee payment requirements; the Texas Finance Code, including disclosure violations, registration violations, contract terms requirements violations, and illegal "debt pooling"; and violations of the Texas Deceptive Trade Practices Act. Pls.' 1st. Am. Compl. at 7-10 ("Pls.' Compl.").

All of the members of the proposed class are customers who have "paid money to USCM ... pursuant to an agreement with USCM." *Id.* at 7. The agreement in question is USCM's Customer Service Agreement ("CSA"), which retains USCM to provide counseling and representation in managing and reducing the customer's debt. *See* App. in Supp. of Pls.' Resp. at 001, 004-005 ("Pls.' App."). The CSA contains a "Mediation/Arbitration" clause, which specifies that

> [i]n regards to any claim, dispute, or issue arising out of this agreement, or the breach thereof, the parties agree first to attempt . . . to settle the dispute by negotiation. . . . [T]hen the parties shall resort to online mediation…before resorting to…binding…arbitration. . . . The parties agree to utilize the American Arbitration Association Rules of Arbitration  . . . .

*Id*. at 005, § 13.

Seeking to enforce the CSA's arbitration clause, USCM has brought its First Amended Motion to Dismiss and Compel Arbitration. In support of its Motion, USCM relies upon the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-15 (2005), which requires that arbitration clauses covering a "controversy arising out of . . . a contract" be held "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

## II.  Analysis

This evaluation of an arbitration clause in connection with a CROA claim, to this Court's knowledge, is a case of first impression in the Fifth Circuit, and some elements addressed herein are of first impression nationally.[1]

Defendant's Motion depends upon there being a valid arbitration agreement recognized under the FAA.  Because this Court concludes that CROA grants a right to sue in court, reinforced by a non-waiver provision, the statute renders void the disputed arbitration clause.  As a result, this Court cannot compel arbitration.

**Liberal Federal Policy Favoring Arbitration**

Adjudication of arbitration agreements is governed by the FAA, which generally declares that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable."  9 U.S.C. § 2.  In considering challenges to arbitration

---

[1] The Court has found no Fifth Circuit cases concerning CROA and arbitration, and only a handful out of circuit, none of which address CROA's protection of the "right to sue," which will be addressed *infra*.  See *Plattner v. Edge Solutions, Inc.*, No. 03 C 2646, 2004 U.S. Dist. LEXIS 13451 (N.D. Ill. Apr. 1, 2004) (forum selection language in an arbitration clause was found unconscionable on grounds that travel costs for debtor would be prohibitive); *Plattner v. Edge Solutions, Inc.*, No.  03 C 2646, 2003 U.S. Dist. LEXIS 25596 (N.D. Ill. Dec. 1, 2003) (forum location specified in arbitration clause was found to be unconscionable); *Arnold v. Goldstar Fin. Sys., Inc.*, No. 01 C 7694, 2002 U.S. Dist. LEXIS 15564 (N.D. Ill. Aug. 20, 2002) (the court was unable to maintain personal jurisdiction over an individual's claims, as an alleged failure to pay a creditor was too remote to provide sufficient contact with forum, but authorization of monthly withdrawals from another's account was deemed sufficient to provide such contacts); *Roe v. Gray*, 165 F. Supp. 2d 1164 (D. Colo. 2001) (court did not have jurisdiction to compel arbitration because a forum selection clause specified a different forum).

agreements, courts are mindful of the FAA's purpose: "to reverse the longstanding judicial

hostility to arbitration agreements . . . and to place arbitration agreements upon the same footing

as other contracts." *Green Tree Fin. Corp. v. Randolph*, 531 U.S. 79, 89 (2000) (citing *Gilmer v.*

*Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991)).  FAA provisions establish a "liberal

federal policy favoring arbitration agreements." *Gilmer*, 500 U.S. at 25 (quoting *Moses H. Cone*

*Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).  Such arbitration agreements are

generally enforceable "save upon such grounds as exist at law or in equity for the revocation of

any contract."  9 U.S.C. § 2.


**The Parties Agreed to Arbitrate**

Courts have established a two-step process by which challenges to arbitration may be

evaluated.  First, courts determine whether the parties agreed to arbitrate their disputes,

considering (a) the validity of the agreement to arbitrate, and (b) whether the agreement

encompasses the dispute between the parties. *Fleetwood Ent. v. Gaskamp*, 280 F.3d 1069, 1073

(5th Cir. 2002).  Second, courts "must consider whether any federal statute or policy renders the

claims nonarbitrable." *R.M. Perez & Assoc., Inc. v. Welch*, 960 F.2d 534, 538 (5th Cir. 1992)

(citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985));

*accord, First Options of Chicago, Inc., v. Kaplan*, 514 U.S. 938, 944 (1995);  *Will-Drill*

*Resources, Inc. v. Williams*, 352 F.3d 211, 214 (5th Cir. 2003);  *Webb v. Investacorp, Inc.*, 89

F.3d 252, 258 (5th Cir. 1996).

At issue here is the CSA's "Mediation/Arbitration" clause. *See* Pls.' App. at 004-005.  A

written agreement to arbitrate is generally presumed to be prima facie valid and enforceable.

4

*Freudensprung v. Offshore Technical Serv.*, 379 F.3d 327, 341 (5th Cir. 2004). Plaintiffs argue, however, that this arbitration clause was drawn "narrowly," meaning that it applies only to claims arising out of the contract, and does not reach their claims, which reference statutes external to the contract. *See* Pls.' Resp. at 3-4. Plaintiffs argue that the CSA's language —"any claim, dispute, or issue *arising out of* this agreement, or breach thereof"— strictly limits arbitration to claims that are "contractual in nature." *Id*. at 4 (emphasis added).

While the Fifth Circuit has employed distinctions between "broad" and "narrow" arbitration clauses, these do not amount to a bright line rule governed by the presence of particular terms. The scope of arbitration clauses indicated by the phrase "arising out of" generally depends upon context and surrounding language. *See Pennzoil Exploration & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1067 (5th Cir. 1998) (describing a "narrow" interpretation of "arising out of" language); *Sedco v. Petroleos Mexicanos Mexican Nat'l Oil*, 767 F.2d 1140, 1145 (5th Cir. 1985) ("arising out of" language found to be "broad" in context). Nevertheless, the Court agrees with Defendant's contention that even a "narrow" reading of the clause would encompass the Plaintiffs' claims. That the Plaintiff cites various federal and state laws challenging the legality of the activities that derive from the CSA does not somehow remove those issues from the ambit of the CSA itself. By the very terms of the Plaintiffs' Complaint, all of their claims relate directly to relationships, obligations, provisions, acts, and omissions allegedly established by the CSA. Indeed, the Plaintiffs' own class description depends upon "consumers . . . entering into a contract for services with Defendant." Pls.' Comp. at 6. Thus, even under a "narrow" interpretation, the arbitration clause covers the issues raised by the Plaintiffs' claims. Therefore, the Court finds it unnecessary to determine whether such

language is "narrow" or "broad."  In light of the "federal policy favoring arbitration . . . ,

ambiguities as to the scope of the arbitration clause itself [should be] resolved in favor of

arbitration."  *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995) (quoting

*Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 476 (1989));

*accord, Primerica Life Ins. Co. v. Brown*, 304 F.3d 469, 471 (5th Cir. 2002) ("[A]ll doubts

concerning the arbitrability of claims should be resolved in favor of arbitration.").


**Legal Grounds for Avoiding Arbitration**

Moving to the second analytical step, "consider[ing] whether any federal statute or policy

renders the claims nonarbitrable," courts have restricted such inquiry to only a few, narrowly

defined avenues.  *R.M. Perez*, 960 F.2d at 538 (citing *Mitsubishi*, 473 U.S. at 628).  As a rule,

attacks upon the validity or legality of a contract as a whole are unavailing:

> [W]here parties have formed an agreement which contains an arbitration
> clause, any attempt to dissolve that agreement by having the entire agreement
> declared voidable or void is for the arbitrator.  Only if the arbitration clause is
> attacked on an independent basis can the court decide the dispute; otherwise,
> general attacks on the agreement are for the arbitrator.

*Will-Drill*, 352 F.3d at 218; *accord, Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S.

395, 403-04 (1967) ("If the claim . . . goes to the 'making' of the agreement to arbitrate — the

federal court may proceed to adjudicate it.  But the statutory language does not permit the federal

court to consider claims . . . [attacking] the contract generally."); *Primerica*, 304 F.3d at 471-72

("When conducting this two-pronged analysis [of challenges to an arbitration agreement], courts

must not consider the merits of the underlying action. . . .  [U]nless a defense relates specifically

to the arbitration agreement, it must be submitted to the arbitrator as part of the underlying

dispute.").

As a result, challenges claiming that —*as a whole* — a contract is illegal, is void as a matter of law, contains forged signatures, or was induced by fraud will generally not serve to defeat an arbitration clause. *Prima Paint*, 388 U.S. at 403-04 (a claim of fraud in the inducement of the entire contract was insufficient to defeat enforcement of an arbitration clause); *Primerica*, 304 F.3d 469 (incompetence of profoundly retarded signatory was insufficient to defeat enforcement of an arbitration clause); *Lawrence v. Comprehensive Bus. Servs. Co.*, 833 F.2d 1159 (5th Cir. 1987) (the illegality of a contract as a whole did not render the arbitration clause itself illegal, and therefore did not defeat arbitration).

Here, the Plaintiffs' Response rests heavily upon arguments that the CSA is void or illegal as a whole. The Plaintiffs assert violations of CROA, including violations of fee-structure prohibitions and disclosure requirements. Pls.' Resp. at 7-9. Among other things, it is also argued that the contract violates Texas Finance Code regulations concerning "debt-pooling" contracts. *Id*. at 10. As a result, Plaintiffs conclude that "[t]he entire Client Services Agreement, including the arbitration clause, is void as a matter of law." *Id*. at 7. It is unnecessary for the Court to consider the strength or weakness of any of these underlying claims; because these challenges attack the contract as a whole, they do not succeed as a basis for avoiding arbitration.[2]

---

[2]   The Court notes that on June 20, 2005, the Supreme Court granted certiorari in *Buckeye Check Cashing, Inc. v. Cardegna*, 125 S. Ct. 2937 (2005), which questions whether the Florida Supreme Court erred by holding — contrary to precedent in six other circuits — that the FAA permits avoidance of arbitration if an underlying contract is illegal. *See Cardegna v. Buckeye Check Cashing, Inc.*, 894 So. 2d 860 (Fla. 2005).

7

However, in addition to their inapposite challenges to the contract as a whole, Plaintiffs also challenge the validity of the arbitration clause itself on the basis of federal law, and it is here that their argument gains traction. *See Will-Drill*, 352 F.3d at 218 ("Only if the arbitration clause is attacked on an independent basis can the court decide the dispute; otherwise, general attacks on the agreement are for the arbitrator."); *accord, Prima Paint,* 388 U.S. at 403-04.

The Supreme Court has identified, *inter alia*, one of the grounds upon which an arbitration clause may be challenged:  "Having made the bargain to arbitrate, the party should be held to it *unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue.*"  *Mitsubishi,* 473 U.S. at 628 (emphasis added);  *accord, Prima Paint,* 388 U.S. at 406 (absent congressional intent to the contrary, an agreement to arbitrate is enforced).  The Supreme Court in *Shearson/Am. Express, Inc., v. McMahon*, 482 U.S. 220 (1987) reiterated this principle:

> Like any statutory directive, the [Federal] Arbitration Act's mandate [to enforce arbitration agreements] may be overridden by a contrary congressional command.  The burden is on the party opposing arbitration, however, to show that *Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue.*  If Congress did intend to limit or prohibit waiver of a judicial forum for a particular claim, such an [intent] "will be deducible from [the statute's] text or legislative history," . . . or from an inherent conflict between arbitration and the statute's underlying purposes.

*Id*. at 226-27 (emphasis added) (quoting *Mitsubishi,* 473 U.S.  at 628).

Deference to congressional intent to preclude judicial waivers is by now a well-established principle, and thus the Court must examine whether Congress has manifested that intent with respect to CROA claims.

8

**CROA Applies to USCM and This Dispute**

Plaintiffs assert that CROA "indisputably applies to the Defendant."  Pls.' Resp. at 8.  The

Credit Repair Organizations Act was enacted, in part, "to protect the public from unfair or

deceptive advertising and business practices by credit repair organizations."  15 U.S.C. §

1679b(2).  The statute applies to:

> [A]ny person who uses any instrumentality of interstate commerce or the
> mails to sell, provide, or perform (or represent that such person can or will
> sell, provide, or perform) any service, in return for the payment of money . . .
> for the express or implied purpose of
>> (i)       improving any consumer's credit record, credit history, or credit
>> rating; or
>> (ii)      providing advice or assistance to any consumer with regard to
>> any activity or service described in clause (i).

15 U.S.C. § 1679a(3).

Plaintiffs note that Defendant advertises that it provides "credit counseling," and that it also

represents — in its Motion, and the sworn affidavit of Daniel Mesch — that it provides "credit

counseling."  Pls.' Resp. at 7-8; and Pls.' App. at 004-005.

The fact that a statute covers the activities of organizations such as USCM, and provides

for remedies for disputes arising out of those activities, would not by itself render agreements to

arbitrate disputes thereunder automatically void:  "[B]y agreeing to arbitrate a statutory claim, a

party does not forego the substantive rights afforded by the statute; it only submits them to their

resolution in an arbitral, rather than a judicial forum."  *Mitsubishi,* 473 U.S. at 628; *cited in*

*Gilmer*, 500 U.S. at 26.  "So long as the prospective litigant effectively may vindicate [his or her]

statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial

and deterrent function."  *Mitsubishi,* 473 U.S. at 637.  As Plaintiffs observe, the arbitration

agreement in *Gilmer* did not waive substantive statutory rights, and was therefore subject to enforcement.  By contrast, they argue, the arbitration clause drafted by USCM does result in an impermissible waiver of consumers' statutory rights.  Pls.' Resp. at 6.

Defendant rightly counters that courts have frequently permitted statutory claims to be resolved through arbitration and have enforced such agreements.  *See* Def.'s Reply Br. in Supp. of Def.'s Mot. to Dismiss and Compel Arbitration at 6 ("Def.'s Reply"); and 1st Am. Mot. to Dismiss and Compel Arbitration at 6 ("Def.'s Mot.") (referencing the Age Discrimination in Employment Act, Sherman Act, Racketeer Influenced and Corrupt Organization Act, Securities Exchange Act of 1934, Securities Act of 1933, and Truth in Lending Act).  However, as will be shown *infra*, the treatment of those other statutory claims does not necessarily determine whether arbitration of the subject statutory claims is subject to avoidance.


**CROA Text and the Non-Waiver of Rights**

Having established the application of CROA to the Defendant, the Plaintiffs point to the statute's non-waiver provisions to argue that the arbitration clause itself is void.  Pls.' Resp. at 9. The statute's non-waiver clause is phrased in unusually comprehensive and precise language:

> Consumer waivers invalid.  Any waiver by any consumer of any protection provided by or any right of the consumer under this title—
> (1) shall be treated as void; and
> (2) may not be enforced by any Federal or State court or any other person.

15 U.S.C. § 1679f(a).

It is notable that the statute provides for avoiding both discrete components of a contract (i.e., "any waiver"), and for avoiding a contract as a whole.  15 U.S.C. § 1679f(c) (providing that

"[a]ny *contract* for services which does not comply with the applicable provisions of this title (1) shall be treated as void; and  (2) may not be enforced by any Federal or State court or any other person") (emphasis added).  These two distinct mechanisms of statutory avoidance are to be compared with the principles for adjudicating arbitration disputes, outlined previously.  Those distinguish challenges to the arbitration clause itself (which are permitted) from challenges to the contract as a whole (which are unavailing).

Properly restricting the inquiry to the non-waiver provisions applicable to components of a contract—15 U.S.C. § 1679f(a)—such as the arbitration clause in this case, the Court considers what rights are actually provided or protected by CROA.


**Are Punitive Damages a Substantive Right under CROA?**

Plaintiffs claim that one such protected right is "the substantive right to seek punitive damages pursuant to the Credit Repair Organizations Act."  Pls.' Resp. at 6.  While CROA provides for punitive damages in section 1679g(a)(2), Plaintiffs cite only non-binding caselaw involving other statutes for the proposition that such damages are "substantive."  See Pls.' Resp. at 6-7.  In its Reply, Defendant also cites non-binding caselaw concerning other statutes for the propositions that punitive damages  (1) are not substantive,  (2) are irrelevant to the question of arbitration, or  (3) that their applicability is for the arbitrator to decide.  In the alternative, Defendant also points to precedent in this district holding that unconscionable provisions in the arbitration agreement may be severed so that arbitration may proceed.  Def.'s Reply at 9-10; *see Carter v. Countrywide Credit Indus., Inc.*, 189 F. Supp. 2d 606, 620 (N.D. Tex. 2002) (Lynn, J.); *Jones v. Fujitsu Network Commc'ns, Inc.*, 81 F. Supp. 2d 688, 693 (N.D. Tex. 1999).

The Court finds aspects of both parties' arguments persuasive.  The availability of punitive damages under section 1679g(a)(2) provides consumers with one means of protection against credit repair organizations that violate the statute.  In addition, section 1679f(a) renders void "[a]ny waiver by any consumer of any protection provided by or any right of the consumer" under the statute.  Thus, the Court need not examine whether punitive damages are a substantive right.  The plain language of CROA prohibits consumers from waiving any protection provided by the statute.  Therefore, a purported waiver by the Plaintiffs of their access to punitive damages is unenforceable.

However, the presence of an impermissible punitive damages waiver within the arbitration clause need not defeat the entire arbitration clause, and thus, this punitive damages waiver will not allow the Plaintiffs to avoid arbitration.  Therefore, In light of the strong federal policy favoring arbitration, and the availability of severance, the Court finds that severance of the punitive damages waiver is appropriate in this case, and such language is severed from the CSA's arbitration clause.

**CROA's Four Labeled Rights and Congressional Intent**

There are only four rights expressly identified as such in the statute.  All four of these rights appear in the same part of the statute: the disclosures section, 15 U.S.C. § 1679c.  The first two rights concern rights that consumers have in relation to credit bureaus, which are not implicated by this suit.  The third and fourth rights specifically concern rights that consumers have in relation to credit repair organizations, such as USCM.  The third right directly addresses the Plaintiffs' claim:  **"You have the right to sue a credit repair organization that violates the**

12

**Credit Repair Organization[s] Act.”** 15 U.S.C. § 1679c(a) (emphasis added).

In *Mitsubishi*, the Supreme Court held that “[h]aving made the bargain to arbitrate, the party should be held to it *unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue*.” 473 U.S. at 628 (emphasis added); *quoted in Gilmer*, 500 U.S. at 29.   The Supreme Court continued: “[I]f Congress intended the substantive protection afforded by a given statute to include protection against waiver of the right to a judicial forum, that intention would be deducible from text or legislative history.”  *Mitsubishi,* 473 U.S. at 628; *quoted in Garrett v. Circuit City Stores, Inc.*, 338 F. Supp. 2d 717, 721-22 (N.D. Tex. 2004) (Lynn, J.); *accord, McMahon*, 482 U.S. at 226 (“[O]nly a contrary congressional command can override the dictates of the FAA.”); *Carter*, 189 F. Supp. 2d at 611 (“[T]he burden is on the party resisting arbitration to ‘show that Congress intended to preclude a waiver of a judicial forum’ for claims arising under the statute at issue.  Such an intention may be found in the text of the statute, its legislative history, or in an ‘inherent conflict’ between arbitration and the statute’s underlying purposes.” (quoting *Gilmer*, 500 U.S. at 26)).

The Court finds that CROA’s non-waiver of rights provisions, combined with its proclamation of a consumer’s right to sue, represent precisely the expression of congressional intent required by *Mitsubishi* and its progeny.


**Meaning of “Right to Sue”**

The Court notes that the statute does not provide a right to “some form of dispute resolution,” but instead specifies a “right to sue.”  The act of suing in a court of law is distinctly different from arbitration.  *See generally Eljer Mfg., Inc. v. Kowin Dev. Corp.*, 14 F.3d 1250,

1254 (7th Cir. 1994) ("Arbitration . . . is a private system of justice" distinct from state and federal courts.).  One cannot satisfy the right to sue protected by CROA by replacing it with an opportunity to submit a dispute to arbitration.  *See generally Morrison v. Colo. Permanente Med. Group, P.C.,* 983 F.Supp. 937, 944 (D. Colo. 1997) ("[C]ases and statutes discuss consistently the terms 'arbitration' and 'civil action' in a manner that leaves no doubt that arbitration is a creature separate from, and not just a form of, a civil action.").  There is no evidence that Congress intended courts to interpret "right to sue" in a way that does not conform with standard legal usage.

To sue is "[t]o institute a lawsuit against (another party)."  BLACK'S LAW DICTIONARY 1473 (Bryan A. Garner ed., 8th ed., 2004).  For "lawsuit," Black's directs us to "suit," *id*. at 905, which is defined: "[a]ny proceeding by a party or parties against another *in a court of law*."  *Id*. at 1475 (emphasis added).  "Suit" is "[a]lso termed *lawsuit*; *suit at law*. . . ."  *Id*.  "Litigation," an oft-used synonym for bringing suit, is defined:  "The process of carrying on a lawsuit . . . , [a] lawsuit itself… ."  *Id*. at 952.

By contrast, "arbitration" is "a method of dispute resolution involving one or more neutral third parties who are usu[ally] agreed to by the disputing parties and whose decision is binding…."  *Id*. at 112; *see also General Motors Corp. v. Pamela Equities Corp.*, 146 F.3d 242, 246 (5th Cir. 1998) ("Arbitration is the reference of a particular dispute to an impartial third person chosen by the parties to a dispute who agree, in advance, to abide by the arbitrator's award issued after a hearing at which both parties have an opportunity to be heard.").  Arbitration is one of several mechanisms of "alternative dispute resolution," which is "[a] procedure for

14

settling a dispute *by means other than litigation*, such as arbitration or mediation." *Id*. at 86 (emphasis added).

Corpus Juris Secundum emphasizes that "[a]rbitration is not a judicial proceeding either at common law or under statutes.  It is a proceeding separate from litigation based upon its underlying purpose of encouraging dispute resolution *without resort to the courts*, and may be characterized as an alternative to litigation." 6 C.J.S. Arbitration § 2 (June 2005) (emphasis added) (citations omitted).


**CROA's Protection of the Right to Sue**

The Credit Repair Organizations Act underscores the "right to sue" in three ways: (1) The right is expressly identified in the language of the Act, (2) the Act renders void any waiver of any rights under the Act, and (3) several affirmative responsibilities are placed upon the credit repair organization itself with regard to that right.  *See* 15 U.S.C. §§ 1679c(a)-(c), 1679f(a).

The credit repair organization is required to: (a) inform the consumer of his or her right to sue; (b) provide such information to the consumer in a separate document containing a verbatim copy of an eight-paragraph text specified by Congress, which enumerates the "right to sue" along with three other labeled rights; (c) obtain from the consumer a signature confirming receipt of such information; and (d) keep such signed confirmations on file for two years from the date of signing.  *Id*. § 1679c(a)-(c).  The statute requires that the eight-paragraph disclosure document be provided "*before* any contract or agreement between the consumer and the credit repair organization is executed."  *Id*. § 1679c(a) (emphasis added).

Whatever other rights may be inferred from the statute, at a minimum it is clear that the four rights appearing in the required disclosure statement are protected.  Having enumerated those four rights, including the right of individuals to sue for violations of CROA, Congress rendered void any waiver of such rights and protections under the Act.  This Court concludes that Congress did not intend to void all waivers of rights under the Act, and require consumers to sign a congressionally mandated enumeration of their rights under the Act, only to permit those very same rights to be waived mere moments later upon the signing an agreement such as the one in question here.

The Court is cognizant of the fact that "by agreeing to arbitrate a statutory claim, a party does not forego the substantive rights afforded by the statute; it only submits them to their resolution in an arbitral, rather than a judicial forum."  *Gilmer*, 500 U.S. at 26.  However, such substantive rights are only suitably addressed in arbitration in the absence of congressional intent "to preclude a waiver of judicial remedies for the statutory rights at issue."  *Mitsubishi,* 473 U.S. at 628.  Having found CROA to express such an intent, to then argue that a congressionally mandated "right to sue" is met equally either by litigation in court or by submittal to arbitration is to obliterate the distinction between these fora.  This Court interprets a "right to sue," as contrasted with a right to make a claim, as a right to bring litigation *in court*.


**FAA and Other Statutes' Non-Waiver Provisions**

As the Defendant has noted, a number of other federal statutes have been held to present little or no obstacle to arbitration.  Def.'s Mot. at 6.  However, CROA presents substantially different protections for consumers than those afforded by the statutes cited by Defendant.

16

In *Mitsubishi*, a car manufacturer plaintiff sought to compel arbitration of an antitrust dispute under the Sherman Act.  473 U.S. 614.  Finding nothing in the Sherman Act or the potential complexity of antitrust claims to preclude arbitration, the Supreme Court noted that both the FAA and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards favor arbitration for disputes in international commerce.

Unlike *Mitsubishi*, where opposition to arbitration relied upon a "judicially implied exception"— which ultimately failed — here, an arbitration agreement is undermined by "express congressional language" in the statute.  *See Mitsubishi,* 473 U.S. at 639.  *Mitsubishi* is additionally distinguished from the present case by its willingness "to subordinate domestic notions of arbitrability to the international policy favoring commercial arbitration," a factor that is not at issue here.  *Id*.

In *McMahon*, brokerage firms, sued by their customers for violations of the Securities Exchange Act and the Racketeer Influenced and Corrupt Organizations Act, sought to compel arbitration based on signed customer agreements.  482 U.S. 220.  The customers failed to demonstrate in either statute's text or history any congressional intent to exempt their claims from arbitration.  Finding that the Securities Exchange Commission itself had specifically approved of arbitration for such claims, the Supreme Court rejected the opposition to arbitration.

By contrast, in the present case, both the text of the statute and the legislative history, addressed *infra*, establish congressional intent to prevent waivers of access to a judicial forum.

In *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477 (1989), the Supreme Court held that a prohibition on waiving "compliance with any provision" of the Securities Act of 1933 did not prevent arbitration merely because the statutory language included

provisions related to venue in federal courts. *Id*. at 482 (quoting 15 U.S.C. § 77n). Indeed, the statutory "grant of concurrent jurisdiction [in state and federal courts] constitutes explicit authorization for complainants to waive…[federal] protections by filing suit in state court without possibility of removal to federal court." The Court further noted that "[t]hese measures…are present in other federal statutes which have not been interpreted to prohibit enforcement of predispute agreements to arbitrate." *Rodriguez*, 490 U.S. at 482 (citing *McMahon*, 482 U.S. 220).

Unlike the Securities Act of 1933, CROA does not prohibit waivers of "compliance," but waivers of "any protection provided by or any right of the consumer under [the statute]." 15 U.S.C. § 1679f(a). CROA's language specifically directs the Court to look for those elements identified by Congress in the Act as "rights," one of which this Court determines is the right to bring suit in a court of law. Additionally, unlike the Securities Act, there is no statutory language in CROA that might be interpreted as granting "explicit authorization for complainants to waive…protections" of any kind. *See Rodriguez*, 490 U.S. at 482. Rather, it expressly invalidates any waiver of any rights or protections granted.

In *Gilmer*, a claimant sought to avoid an employment contract's arbitration clause on the theory that arbitration "deprives claimants of the judicial forum provided for by the [Age Discrimination in Employment Act]" ("ADEA"). 500 U.S. at 29. In rejecting that argument, the Supreme Court explained that "[i]f Congress intended the substantive protection afforded by the ADEA to include protection against waiver of the right to a judicial forum, that intention will be deducible from text or legislative history." *Id*. The ADEA did contain a non-waiver provision—"an individual may not waive any right or claim under this Act *unless the waiver is*

18

*knowing and voluntary*" (emphasis added)—but it did not treat access to a judicial forum as a

right.  Rather, the ADEA took a "flexible approach to resolutions of claims" and even "directed

[the Equal Employment Opportunity Commission] to pursue 'informal methods of conciliation,

conference, and persuasion,' which suggest that out-of-court dispute resolution, such as

arbitration, is consistent with the statutory scheme established by Congress."  *Id.*  (quoting 29

U.S.C. § 626(b)).

Unlike the ADEA, CROA specifically identifies access to a judicial forum as a right and

evinces no such "flexibility" toward alternative means of dispute resolution.  Additionally, where

the ADEA permits waivers of statutory rights that are "knowing and voluntary," CROA flatly

rejects "[a]ny waiver by any consumer of any protection provided by or any right of the consumer

under this title" regardless of any party's knowledge or intent.  15 U.S.C. § 1679f(a).  By the text

of the statute, all waivers of rights and protections under CROA are simply void.

In *Green Tree*, a consumer sought to avoid arbitration of a Truth in Lending Act dispute

with a financing company by arguing that the cost of arbitration would be prohibitive.  531 U.S.

79; *see also* 15 U.S.C. §§ 1601 *et seq*.  The Supreme Court held that the party seeking to avoid

arbitration on such grounds "bears the burden of showing the likelihood of incurring such costs."

*Green Tree*, 531 U.S. at 92.  In that case, "neither during discovery nor when the case was

presented on the merits was there any timely showing at all on the point."  *Id.*  Lacking all

evidence of prohibitive costs, the argument against arbitration was rejected.

Unlike *Green Tree*, in the present case, arbitration has not been challenged on the basis of

prohibitive costs, but on the grounds articulated in *Mitsubishi*, that "Congress itself has evinced

an intention to preclude a waiver of judicial remedies for the statutory rights at issue."

*Mitsubishi,* 473 U.S. at 628.

In *Garrett,* this Court held that an arbitration agreement between an employee and an employer was superseded by the Uniformed Services Employment and Reemployment Rights Act ("USERRA").  338 F. Supp. 2d 717.  This Court found that the statute's "text and legislative history evidence Congress's clear intent to treat the right to a jury trial as a right not subject to waiver in favor of arbitration." *Id.* at 722.

As does USERRA, CROA contains express language providing for a right to a judicial forum, a non-waiver of such rights, and legislative history confirming congressional intent to protect the right to sue.

**Legislative History**

The statute's history supports the Court's understanding of the clear terms of the Act.  In 1988, the statute now known as the Credit Repair Organizations Act was submitted as H.R. 458: "A Bill to Prevent Consumer Abuse by Credit Repair Organizations."  That same year, Representative Frank Annunzio, Chairman of the House Subcommittee on Consumer Affairs and Coinage, convened hearings, and the influence of those proceedings is readily seen in the final version of the statute, which was passed in 1996.  *See Credit Repair Organizations Act: Hearing on H.R. 458 Before the Subcomm. on Consumer Affairs and Coinage of the Comm. on Banking, Finance and Urban Affairs*, 100th Congress, 2nd Sess. (Sept. 15, 1988) ("Hearing").

Chairman Annunzio opened by noting that

> [c]redit repair clinics pose a threat to consumers who can least afford it.  These
> organizations hold out the promise of a quick credit fix at a high cash price.  They

> prey on consumers whose often dire straits and dreams of a better life make them
> susceptible to the false promises of unscrupulous credit clinic operators.

*Id*. at 1-2.

Jeffrey Roberts—a repentant former co-owner of a credit repair organization who visited the hearing en-route to incarceration for credit-related violations—observed: "In my opinion, there is no such thing as credit repair, so instead of being regulated, the industry should be outlawed. If not, the regulation should be so tough and the bond so high that people are discouraged from going into business." *Id*. at 9.

In short, the legislative history expresses an earnest intent by Congress to protect consumers from those thought likely to victimize them.[3] In a general sense, that history is consistent with a desire to prevent those same businesses from insisting that allegedly victimized consumers wave rights expressly granted by CROA.

**Federal Trade Commission Recommendations**

The commentary submitted by Daniel Oliver, then Chairman of the Federal Trade Commission, is illuminating as to congressional intent. Chairman Oliver supported the proposed bill, but also criticized it for not going far enough. He provided reasoning and specific recommendations for strengthening the bill's enforcement provisions, and many of these suggested changes appear in the final version. The recommendations adopted by Congress

---

[3] The Court notes that while the legislative history of CROA reflects significant congressional bias against the "credit repair" industry generally, such background does not indicate, *a priori*, that USCM is engaged in some prohibited activity, nor does this Court express any opinion about the legitimacy of the services offered by USCM, whether they be "credit repair," "advice," or "assistance." Indeed, at this time, the Court is not addressing the merits of the Plaintiffs' claims.

suggest agreement with Oliver's analysis.

Oliver noted that the proposed bill "provides consumers with the right to sue for a violation of any of its provisions," and that one of the obvious benefits of such a provision is that "[t]his private right of action should help to make the statute self-enforcing." Hearing at 178. However, he argued that in addition to simply providing for that right, the statute ought to require that disclosures of such rights be made to the consumer directly, and, "so as to avoid possible obfuscation…, credit repair organizations [should] be required to follow language that is identical or substantially similar to model language proposed by Congress." *Id*. at 175. In other words, Congress should control the terms used by covered organizations to inform a consumer of his or her rights under the statute. Congress did adopt that approach in the final version, and much of the required language clearly derives from Oliver's recommendations.

The "right to sue" that Oliver referenced originally appeared in section 410 of the 1988 version, employing language that would no doubt have been somewhat foreign to most consumers without legal training: "An action to enforce any liability created under this Act may be brought in any appropriate United States district court without regard to the amount in controversy, or in any other court of competent jurisdiction. . . ." *Id*. at 153. While the text clearly provided a right to sue, the original proposed consumer disclosure did *not* mention this right. Oliver recommended that the following language be added to the disclosure requirement: "You have the right to sue a credit repair or credit improvement company that violates the Credit Repair Organizations Act." *Id*. at 175. In the final 1996 version, in line with Oliver's recommendations, the right to sue language was moved from the interior of the statute to the

disclosure statement itself: "You have a right to sue a credit repair organization that violates the

Credit Repair Organization[s] Act."  15 U.S.C. § 1679c(a).

The final version employs the "simple, non-technical language" that Oliver recommended,

and the need for such language becomes apparent in the hearing findings: "[M]any people who

come through the door of credit repair agencies," according to Roberts, "do not have the

educational level or the ability to understand what the contract actually says and they are being

totally misled by fast speaking con artists. . . ."  Hearing at 11.  The susceptibility of

unsophisticated consumers to abuse is reiterated in the 1996 statute's findings, specifically noting

that "[c]ertain advertising and business practices of some companies engaged in the business of

credit repair services have worked a financial hardship upon consumers, particularly those of

limited economic means and who are inexperienced in credit matters."  15 U.S.C. § 1679(a)(2).

By moving the "right to sue" language from the interior of the statute (where it would remain

"hidden" to most consumers unfamiliar with federal statutes) to the required disclosure statement

to be presented in clear verbatim language to every customer of such an organization, Congress

followed FTC Chairman Oliver's recommendations for emphasizing and reinforcing consumers'

rights.

While the proposed bill in 1988 specified a right to sue "in…any…court of competent

jurisdiction," such qualifying language — which does not appear in the final 1996 version — is

merely redundant: a right to sue is a right to sue in a court of law, just as a binding arbitration

agreement is a waiver of that right to sue.  *See* Hearing at 153.  The statute's disclosure statement

employs common, easily understood terms "so as to avoid possible obfuscation."  *Id*. at 175.

This Court will not adopt a non-standard interpretation of the right to sue contrary to that clear

23

purpose.

### III.  Conclusion

By the express terms of the statute, consumers "have a right to sue a credit repair organization that violates the Credit Repair Organization[s] Act," and "[a]ny waiver by any consumer of any protection provided by or any right of the consumer under [CROA] . . . shall be treated as void."  Further, any such waiver "may not be enforced by any Federal or State court or any other person."  15 U.S.C. §§ 1679c(a), 1679f(a).  The CSA arbitration clause in question, which was drafted by the Defendant and signed by the Plaintiffs, constitutes a waiver of a consumer's right to sue under the Act.  Therefore, that waiver is void as a matter of law, and this Court shall not enforce it.  For all of the above-stated reasons, Defendant's Motion is DENIED.

**SO ORDERED.**

September 1, 2005.

Barbara M. G. Lynn

UNITED STATES DISTRICT JUDGE